IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-180 |
| | ) | |
| | ) | <u>BILL OF INDICTMENT</u> |
| v. | ) | |
| | ) | Violations: |
| | ) | 18 U.S.C. § 1347 |
| COLBY EDWARD JOYNER | ) | 18 U.S.C. § 1035 |
| | ) | |

**THE GRAND JURY CHARGES:**

That, at the specified times and at all times material to this Indictment:

**INTRODUCTION**

1. From in or around October 2018 through approximately August of 2019, the defendant, COLBY EDWARD JOYNER, who is and was a licensed medical professional, worked for a physician staffing and telemedicine company and prescribed expensive and medically unnecessary genetic testing for hundreds of Medicare beneficiaries residing in the State of North Carolina—individuals who he had never met, seen or treated, and with whom he may have had only a brief telephone conversation, or no interaction with whatsoever. In furtherance of this scheme to defraud Medicare JOYNER falsified medical records in connection with these prescriptions to conceal that: he was not the Medicare beneficiaries' treating physician; he did not conduct medical evaluations or examinations; and the tests were not reimbursable. JOYNER's conduct resulted in the submission of over $10 million in false and fraudulent claims for payment to Medicare, for which Medicare paid over $3.6 million.

<u>The Medicare Program</u>

2. The Medicare Program ("Medicare") was a federally funded health care program

1

that provided free or below-cost health care benefits to certain individuals, primarily the elderly (65 years of age or older), blind, or individuals with certain disabilities. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

3. The Medicare program covered different types of benefits and was subdivided into multiple "parts." Medicare Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits and laboratory tests that were medically necessary and ordered by licensed medical doctors or other health care providers.

4. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).

5. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area.

6. In order to file claims with Medicare for reimbursement for services provided to beneficiaries, physicians, clinics and other health care providers were required to apply for and obtain a unique identifying number, commonly referred to as a "provider number," through an enrollment process.

7.      Specifically, in order to enroll in the Medicare program, physicians and eligible health care providers were required to complete an application known as the CMS Form 855. The CMS Form 855 application contained certifications from the provider that they agreed, among other things: (a) to abide by Medicare laws, regulations, and program instructions; (b) understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (c) and to not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

8.      To receive reimbursement for a covered service from Medicare, a provider needed to submit a claim, either electronically or using a form, containing certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as his or her provider number.

## Genetic Testing

9.      Medicare did not cover items or services that were not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.

10.     Medicare regulations explicitly stated that Medicare did not cover screening tests or, more specifically, "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury," subject to limited statutory exceptions not applicable here (*e.g.*—screening mammography, colorectal cancer screenings, screening pelvic exams and prostate cancer screening tests).

11. If laboratory testing was medically necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering such tests. In particular, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). The regulations explicitly stated that: "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

12. Cancer genomic ("CGx") testing was a laboratory test that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing cancer or otherwise determining whether an individual presently had cancer.

13. Medicare only covered CGx testing in limited circumstances, such as when a beneficiary had cancer or symptoms of cancer, and the CGx testing, according to Medicare coverage requirements: (1) was medically necessary for the treatment of that cancer; and (2) the test results were used to treat the cancer or symptoms of cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or who lacked symptoms of cancer.

14. Pharmacogenetic ("PGx") testing was a DNA test that was used to detect specific variants in genes that impacted the metabolism of certain medications. In other words, PGx testing could help determine whether certain medications would be effective if used by a particular patient and whether the patient would be at risk of experiencing side effects from a specific medication. Typically, medical practitioners used PGx testing to choose drugs that worked for their patients,

4

to avoid new medicines or drugs that could cause unwanted side effects, and in determining the most effective drug dosage for their patients.

15. Medicare only covered PGx testing when it was: (a) reasonable and necessary; (b) ordered by the beneficiary's treating provider if that provider had the licensure, qualifications, and necessary experience and training to both diagnose the condition being treated and to prescribe medications for the condition; (c) the clinical record showed the use of or intent to prescribe one or more drugs that had known drug-gene interactions and the test was ordered for the purpose of determining whether the drugs were safe for use. PGx testing was not reasonable and necessary merely on the basis of a patient having a particular diagnosis.

## Telemedicine

16. Telemedicine, generally, provided a means of connecting patients to doctors and facilitating doctor-patient interactions through telecommunications technology.

17. Many professional services provided by a health care provider were reimbursable under Part B and pursuant to the Medicare Physician Fee Schedule when furnished via telecommunications technology and in accordance with Medicare's requirements governing "telehealth." This meant that a provider who furnished a consultation through a telehealth encounter could be reimbursed by Medicare for that consultation if all of Medicare's conditions for coverage were met.

18. During the timeframe of the conspiracy described below, Medicare only covered telehealth encounters if they were conducted in accordance with its requirements, which were that: (a) that the beneficiary was located in a rural or health professional shortage area; (b) the services were delivered via an interactive telecommunications system, not simply by telephone or email; (c) the beneficiary was at a practitioner's office or specified medical facility—not in the beneficiary's own home—during the telehealth medical consultation; (d) the ordering provider

5

was a physician or other qualified health professional; (e) the service performed was one that was approved by Medicare as a telehealth service; and (f) the medical examination was under the provider's control.

19. Medicare regulations regarding telehealth concerned payment for telehealth consultation services only and did not prohibit providers from referring services for beneficiaries when the professional service component (consultation) itself was not billed to Medicare. However, Medicare required that an enrolled provider who desired to be compensated for professional services rendered to a beneficiary, such as a consultation or medical evaluation, bill Medicare for those services—*i.e.*, an enrolled Medicare provider could not seek payment from a Medicare beneficiary, another source, or third party for those services.

The Defendant and Related Entities and Individuals

20. At all relevant times, JOYNER was a resident of Monroe, Union County, North Carolina. On or around February 12, 2016, JOYNER obtained licensure from the state of North Carolina to perform services as a physician assistant ("PA") in accordance with North Carolina's laws governing the practice of medicine.

21. JOYNER became an enrolled Medicare provider in 2016. In doing so, JOYNER certified to Medicare that he would comply with all Medicare rules, regulations and program instructions applicable to him, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

22. JOYNER had full-time employment with a Charlotte-based medical practice as a PA, and, during 2018 and 2019, also worked as an independent contractor for a physician staffing and telemedicine company and its subsidiaries and affiliates (collectively, "Company 1"). JOYNER was paid by Company 1 to perform purported telemedicine consultations and to sign lab

6

requisition forms (*i.e.* orders or prescriptions) for CGx and PGx testing for patients provided to Company 1 by its "clients."

23. During the course of his work for Company 1, JOYNER signed prescriptions for CGx and PGx tests for hundreds of Medicare beneficiaries who, at the time, resided in the State of North Carolina and within the Western District of North Carolina, including beneficiaries C.B., C.C., F.B., L.G., C.M., and T.B.

24. Multiple diagnostic testing labs then received the orders and prescriptions signed by Company 1's contract medical professionals, including JOYNER, and submitted or caused the submission of claims to the Medicare program for reimbursement.

## Purpose of the Scheme and Artifice

25. It was a purpose of the scheme and artifice to defraud for JOYNER and others known and unknown to the Grand Jury to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare for CGx and PGx lab tests that were: (i) medically unnecessary, (ii) not covered by Medicare and not eligible for Medicare reimbursement, and (iii), in some instances, not provided as represented; and (b) concealing and causing the concealment of the scheme and the submission of false claims by making and causing false statements and representations to be made in patient medical records, and falsely certifying, among other things: (i) that the records were true, accurate and complete, (ii) the tests were prescribed by the beneficiary's treating physician and would be used in furtherance of the beneficiary's treatment, and (iii) that services ordered for beneficiaries were reasonable and medically necessary.

## Manner and Means of the Scheme

26. The manner and means by which JOYNER and others known and unknown to the Grand Jury sought to accomplish the purpose of the scheme included, among other things, the following:

27. JOYNER worked with Company 1 as an independent contractor to sign laboratory requisition forms for patients who were pre-selected for CGx and PGx testing, including but not limited to beneficiaries C.B., C.C., F.B., L.G., C.M., and T.B., and that were provided to him by Company 1 and its clients.

28. JOYNER received pre-populated and unsigned laboratory requisition forms, related medical records and Medicare beneficiary information (including Medicare numbers), for hundreds of Medicare beneficiaries through Company 1 and its clients. JOYNER received alerts that records pertaining to beneficiaries—with whom he had no pre-existing treatment relationship—were available for his review and signature. JOYNER gained access to these records and beneficiary health information through electronic mail and document sharing and technology platforms, in order to electronically sign prescriptions for genetic tests and related medical records.

29. JOYNER either had a short telephone conversation, or, in most instances, no telephone conversation or interaction with the beneficiaries whatsoever, and, without performing a medical evaluation or examination of the beneficiaries, electronically signed fraudulent prescriptions for genetic testing, and related medical records.

30. JOYNER did not provide medical or diagnostic treatment options for patients besides these genetic tests during the purported telemedicine consultations.

31. JOYNER did not bill Medicare for or seek reimbursement for the purported telemedicine consultations with the beneficiaries. Instead, JOYNER was paid approximately $12, and later, $15 per purported consultation by Company 1.

32. JOYNER and others known and unknown to the Grand Jury concealed and disguised the scheme by preparing and causing to be prepared false and fraudulent documentation supporting the CGx and PGx and prescriptions, including documentation in patient medical records in which JOYNER, among other things: (a) falsely certified that he determined, through his interaction with the Medicare beneficiary, that the services ordered for the beneficiary were reasonable and medically necessary; (b) falsely represented that the beneficiary was his patient, and that he would receive genetic test results in order to make patient-specific treatment decisions and pursue further care for his patient; and (c) falsely attested that the information contained in patient medical records was true, accurate and complete.

33. Multiple diagnostic testing laboratories submitted and caused to be submitted false and fraudulent claims to Medicare for the CGx and PGx prescriptions signed by JOYNER.

34. To execute and attempt to execute the scheme and artifice, over the course of approximately 11 months, JOYNER, aided and abetted by others known and unknown to the Grand Jury, caused the submission of false and fraudulent claims to Medicare in excess of approximately $10 million for CGx and PGx tests that were not reasonable or medically necessary, not covered by Medicare and ineligible for Medicare reimbursement, and at times, not provided as represented, for which Medicare paid over approximately $3.6 million. These false and fraudulent claims included, but were not limited to, claims for reimbursement for genetic testing prescribed to beneficiaries C.B., C.C., F.B., L.G., C.M., and T.B.,

## COUNT ONE
## 18 U.S.C. § 1347
### (Health Care Fraud)

35. Paragraphs 1 through 34 of this Bill of Indictment are re-alleged and incorporated by reference as though fully set forth herein.

36. From in or around October 2018, and continuing through on or around August 2019, in Union County, in the Western District of North Carolina, and elsewhere, the defendant,

**COLBY EDWARD JOYNER,**

aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as that term is defined under Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services.

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS TWO THROUGH SEVEN
### 18 U.S.C. § 1035(a)
### (False Statements Relating to Health Care Matters)

37. Paragraphs 1 through 34 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

38. On or about the dates listed below, in Union County, within the Western District of North Carolina and elsewhere, the defendant,

**COLBY EDWARD JOYNER,**

aided and abetted by others known and unknown to the Grand Jury, in a matter involving a health care benefit program, specifically, Medicare, did knowingly and willfully: (a) falsify, conceal, and cover up by trick, scheme and device material facts; and (b) make materially false, fictitious, and fraudulent statements and representations and make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, in that he prepared and signed medical records, including laboratory requisition forms in which

10

he: (a) falsely certified that he determined, through his interaction with the Medicare beneficiary, that the service or services ordered for the beneficiary were reasonable and medically necessary; (b) falsely stated that the beneficiary was his patient, and that he would receive genetic test results in order to make patient-specific treatment decisions and pursue further care for his patient; and (c) falsely attested that the information contained in patient medical records was true, accurate and complete, with the claims that JOYNER caused to be submitted for each beneficiary listed below, supported by a falsified patient medical record or records, forming a separate count:

| Count | Beneficiary | Approximate Date(s) | Record(s) Containing False Statements and Concealment of Material Facts |
|---|---|---|---|
| TWO | C.B. | 02/19/19 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx and PGx testing |
| THREE | C.C. | 03/26/19 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx and PGx testing |
| FOUR | F.B. | 12/28/18 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx testing |
| FIVE | L.G. | 03/22/19 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx and PGx testing |
| SIX | C.M. | 12/06/18 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx testing |
| SEVEN | T.B. | 02/05/19 | Medical records, laboratory requisition forms and letters of medical necessity associated with prescriptions for CGx and PGx testing |

All in violation of Title 18, United States Code, Sections 1035(a) and 2.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under § 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or

11

Case 3:22-cr-00180-RJC-SCR    Document 1    Filed 07/19/22    Page 11 of 12

referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The following property so subject to forfeiture in accordance with sections 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant to the extent of the value of the property described in (a).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment in the amount of at least $17,628.00, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL

_____
GRAND JURY FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

_____
KATHERINE T. ARMSTRONG
ASSISTANT UNITED STATES ATTORNEY

_____
MATTHEW WARREN
ASSISTANT UNITED STATES ATTORNEY